E-FILED
Tuesday, 24 August, 2021  02:06:55 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

SCOTT J.D.,
      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

Case No. 4:20-cv-04020-JEH

**Order**

Now before the Court is the Plaintiff Scott J.D.'s Motion for Summary Judgment (Doc. 13), the Commissioner's Motion for Summary Affirmance (Doc. 15), the Plaintiff's "Answer to Defendant's Motion of Summary Affirmance" (Doc. 16), and the Plaintiff's "Supplement to Plaintiff's Answer to Defendant's Motion of Summary Affirmance" (Doc. 17).[1]  For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Commissioner's Motion for Summary Affirmance.[2]

**I**

Scott J.D. previously filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on August 6, 2012, alleging disability beginning on May 19, 2011.  Those applications were ultimately unsuccessful – an ALJ issued an unfavorable decision on February 7, 2014 and the Appeals Council (AC) denied Scott's request for review of that decision in November 2014.  On

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 10, 11).
[2] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears at (Doc. 6) on the docket.

November 8, 2014, Scott filed applications for DIB and SSI, again alleging disability beginning on May 19, 2011.  His DIB and SSI claims were denied initially on March 11, 2015 and upon reconsideration on September 17, 2015.  Scott filed a request for hearing concerning his DIB and SSI applications which was held on May 19, 2017 before the Honorable John M. Wood (ALJ).  At that hearing, Scott's counsel indicated that the alleged onset date was February 8, 2014 (thus, amended) and stated said date "is the day after [Scott's] first application became final."  AR 180.  Both Scott and a vocational expert (VE) testified at the May 2017 hearing.  Following that hearing, Scott's claims were denied on November 24, 2017.  After Scott requested AC review, the AC vacated the ALJ's November 2017 decision and remanded the case for further evaluation and proceedings.

On October 26, 2018, a second hearing was held via video before the same ALJ, Scott was again represented by an attorney, and Scott, his father, and a VE testified.  The ALJ issued a Decision on January 10, 2019, finding Scott not disabled through his date last insured of December 31, 2016 but finding him disabled beginning on December 6, 2018 (the day before his 55th birthday).  His request for review by the AC was denied on December 6, 2019, making the ALJ's January 2019 Decision the final decision of the Commissioner.  Scott timely filed the instant civil action seeking review of the ALJ's January 2019 Decision on February 4, 2020.

## II

At the May 2017 hearing, Scott was 53 years old and lived in a downstairs apartment separate from the upstairs residence where his parents lived.  He testified he moved there because his parents "had to help take care of me."  AR 183.  Before December 2015, Scott lived by himself in a house where his ability to get up and down stairs there became worse over time.  On his November 2014 Form SSA-3368, Scott claimed the following conditions limited his ability to work: chronic sinus disease; arthritis; spinal stenosis; ruptured discs; and post-traumatic

2

stress disorder (PTSD).  AR 618.  He previously worked as an insurance agent and had not had a paycheck since May 2011.  He attempted to return to work as an insurance agent after May 2011, but he testified a combination of insomnia, depression, and not being able to sit, stand, or walk for any period of time precluded that return.  AR 189.

Scott testified that he stopped driving in early 2015 because, based upon his own determination, he thought it was no longer safe to drive.  He said his sister, her husband, and Scott's dad would come and help with yard work and housework when he lived alone, though Scott did indoor things that needed to be done day-to-day.  He was independent in personal hygiene.  At the time of the hearing, Scott did not wash dishes, sweep, mop, vacuum, or clean the bathrooms.  Scott confirmed that from the summer of 2016 to November 2016 he rode his bike as "physical therapy," could go short distances, and did so twice a week.  AR 192.  However, he had not ridden his bike in 2017 because he "hadn't felt up to it."  *Id.*

Scott also testified that the combination of insomnia (caused by manic depression) and headaches would preclude him from doing unskilled work.  He said his job ended in 2011 because he was so tired all the time such that his job performance was bad.  He explained that while his back problems dated back to the 1990s, 2005 was when his mental depression began.  Those mental health issues started – he was diagnosed with PTSD – following the death of his first child just before the child was born.  His cervical spinal issues interfered with his side to side and backward neck movement and caused pain to radiate down to his fingers.  He had back surgery in the late 1990s, reinjured his back three years after surgery, and did not have any additional back surgery.  His lower back pain extended down both legs into the toes.  His combination of medications for mental health helped lower symptoms from a seven out of 10 down to a three or four, "but no symptoms totally disappear."  AR 209.  His combination of medications for physical issues

provided relief, taking the pain down from a seven or eight out of 10 to three/four, "but not down to zero ever." AR 214.

At the October 2018 hearing, Scott was 54 years old and still lived downstairs from his father – his mother had passed away since the last hearing. Scott testified that since the last hearing, he stayed in the basement "pretty much by [himself] most of the time" and did not like being around people "all that often." AR 154. He continued to have sleep issues and headaches, but he decided to "really make an effort" after his mother died and tried to become "a normal person again." AR 155. He attempted to start a lawncare business, but his back problems limited him from following through. He explained that two hours of any combination of sitting, standing, or walking resulted in him having to lay down. He even interviewed for a job and made it through the initial interviews. At the final interview, however, his back started hurting and he felt faint and did not remember if he passed out or not but he remembered sitting there and people asking him if he was all right.

His 11-year-old daughter stayed with him from Saturday mornings until Sunday nights, though a lot of weekends she had softball and could not stay the weekend with Scott. He therefore started driving again as of a week before the hearing so that he could start attending his daughter's games. He started riding a stationary bike on March 10, 2018 and did so three times a week. He thought he only rode a "real bike" twice in 2018. AR 161. He rode the stationary bike and also started exercises in March 2018 to strengthen his core "to help [his] back to hopefully" get "back in shape to . . . hopefully be able to return to some sort of job." AR 162.

Scott's father was then questioned by Scott's attorney. Scott's father testified that his son's anxiety started about 12 or 13 years before and he did not want to see people. His father further stated Scott improved in that he talked to more

4

people than he used to. As for Scott's attempt at starting a lawncare business, his father testified Scott "just couldn't do it" because his back bothered him and he got headaches. AR 166. He described Scott's day-to-day as going to bed for an hour and waking up and staying up nearly all night, experiencing similar issues in the daytime, and shying away from everything. Scott mowed the lawn at their residence using a riding tractor, he did his own wash, and he cooked his own food.

Lastly, the ALJ questioned the VE. The VE testified that an individual with the same past work activity as Scott who was limited to light work with no climbing of ladders, ropes, or scaffolds and the occasional performance of other postural functions, who needed to avoid environmental hazards, who could frequently perform all manipulative functions, who needed to have the option to alternate periodically between standing and/or walking and a seated position throughout the workday, who had moderate deficits in concentration, persistence, and pace, and would have moderate social limitations could not do Scott's past work. However, such an individual of the same age as Scott and with the same education and work history could perform the representative unskilled work of marking clerk, routing clerk, and mail sorter. The VE also testified that a person would be required to stay on task 90% of the work day outside of normal breaks and rest periods and could be absent from work a maximum of two days per month.

### III

In his January 10, 2019 Decision, the ALJ first explained Scott met the insured status requirements of the Social Security Act through December 31, 2016. At Step Two of the of the five-step test, the ALJ determined Scott had the following severe impairments since the alleged onset date of disability of February 8, 2014: degenerative disc disease of the lumbar and cervical spines; history of headaches; sleep disorder; affective disorder; anxiety disorder; and PTSD. AR 116. At that

step, the ALJ considered the medical records which revealed Scott sought treatment for chronic neck and back pain, pancreatitis, abdominal pain, anxiety, chronic sinusitis, headaches, depression, elevated blood pressure, his mood, and insomnia.  The ALJ also considered that a doctor recommended in June 2012 that Scott stop drinking as that could be the cause of his mood disorder, that head MRI and CT scans in 2012 and 2013 revealed no abnormalities, that Scott was not always compliant with taking psychotropic medications, that a 2014 brain MRI was stable since the 2012 MRI, that Scott reported in June 2014 he planned to start working again soon, and that a doctor speculated in October 2014 that the primary driving cause of Scott's headaches was likely an underlying mood disorder with opioid induced transformation and hyperalgesia.  The evidence also provided that Scott had a CPAP machine but did not use it, that in December 2014 physical therapy was ordered and a cervical epidural injection was recommended with follow up in three months but there was no evidence Scott returned, that it was recommended Scott seek treatment from a psychiatrist, that he was exercising regularly and losing weight in December 2016, and that he failed to keep a mental health clinic appointment.  In June 2018, Scott reported to a medical provider that he was watching his diet and exercised six days per week.

At Step Three, the ALJ determined Scott had:  mild restrictions in the ability to understand, remember, or apply information; moderate restrictions in the ability to interact with others; moderate restrictions in the ability to concentrate, persist, or maintain pace; and no limitations in the ability to adapt or manage oneself such that his mental impairments of depression, anxiety, and history of PTSD singly and in combination did not meet or medically equal the criteria of the relevant listings.  While there was "some" evidence of a diagnosis of sleep apnea and references to insomnia, the ALJ pointed out Scott had failed to comply with

6

treatment.  AR 121.  At Step Four, the ALJ made the following residual functional capacity (RFC) finding:

> [S]ince February 8, 2014, the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can never climb ladders, ropes or scaffolds; limited to engaging in other postural functions occasionally; requires the ability to alternate periodically equally between standing and sitting at no more than 30 minute intervals if desired; manipulative functions are limited to frequent; must avoid hazards, and avoid concentrated exposure to loud or very loud environments, and to vibrations.  Mentally, he is limited to understanding simple and routine instructions, making simple work-related decisions, and to the performance of simple and routine tasks on a sustained basis with only regular work breaks, and with little or no change in work settings or duties; no interaction with the public, and occasional interaction with coworkers and supervisors.

AR 123.

The ALJ noted that at the first hearing Scott alleged he could not work due to a combination of physical and mental impairments, and at the second hearing he acknowledged his mental health had improved, he still had significant back problems, and he had participated in rehab on his back in order to be able to work longer.  The ALJ detailed Scott's daily activities that were reported at all three hearings, observed the record revealed no evidence of any significant side effects from current medications, and explained Scott's GAF scores were considered but were not indicative of mental health conditions that would preclude him from engaging in substantial gainful activity.  The ALJ rejected a medical provider's May 2013 disability insurance note that Scott was unable to work because the determination of disability was one reserved to the Commissioner and updated treatment records documented improvement in headaches which the provider stated was a reason for Scott's inability to work.  The ALJ also articulated his reasons for rejecting opinions provided by Scott's treating Advanced Practice

7

Nurse (APN) Sommer Livengood.  The ALJ also gave no weight to treating provider Andrew Stevenson, D.O.'s June 2013 form because he provided no limitations or restrictions regarding Scott's functional abilities, and the form appeared to be incomplete.

> The ALJ reasoned:
>
> As a whole, the claimant's testimony regarding his daily functioning failed to be corroborated by the generally unremarkable objective findings from his examinations and the claimant's reports of daily activities from his treatment records . . . He has alleged insomnia would prevent him from performing simple or unskilled work. However, there is no objective medical evidence of a sleep disorder, other than a diagnosis of mild to moderate sleep apnea in 2005, and a prescription of Trazodone for sleep.  He has chronic back and neck pain and history of headaches, but objective findings have been limited as noted above . . . He testified at the most recent hearing, that he had improved somewhat since the last hearing, and he was now performing a range of activities such as mowing the lawn and household chores.

AR 126-27.  The ALJ concluded his consideration of the record evidence for purposes of the RFC assessment by summarizing and addressing the substance of Scott's friends' and family's submitted statements.  He gave them "some weight" when determining Scott's RFC and the severity of his mental impairments, but he found the statements not fully consistent with Scott's objective examination findings from his treatment records.  AR 127.  The ALJ found that since February 8, 2014, Scott had been unable to perform any past relevant work.

At Step Five, the ALJ found that prior to December 6, 2018, considering Scott's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could have performed. However, beginning on December 6, 2018 – the date Scott's age category changed – considering his age, education, work experience, and RFC, there were no jobs

that existed in significant numbers in the national economy that Scott could perform.

IV

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566; 416.966.[3] The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous

---

[3] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

9

period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980).  The factual determination is made by using a five-step test.  *See* 20 C.F.R. §§ 404.1520; 416.920. In the following order, the ALJ must evaluate whether the claimant:

    1)    currently performs or, during the relevant time period, did perform any substantial gainful activity;

    2)    suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

    3)    suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

    4)    is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

    5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

    The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id*. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).   In the instant case, Scott claims error on the ALJ's part at Steps Four and Five and otherwise complains of the Social Security Administration's handling of his applications.

## A

In his initial brief, Scott points out several "facts" from the record including, among other things, that:  he had both physical and mental conditions well documented prior to his date last insured in December 2016; primary treater APN Livengood stated in October 2012 that Scott was disabled "prior to [her] era;" lumbar and cervical spine MRIs in 2012 showed spinal inflictions which all got worse over time; and the VE at the 2014 hearing testified that all competitive employment would be precluded for an individual who missed two or more work days per month and was off task 15-20 percent of the work day.  He thus argues that he "fulfilled the requirements to be considered disabled effective November 8, 2014."[4]  (Doc. 13 at pg. 5).  The Commissioner emphasizes the fact that Scott, represented by counsel at the time, amended his alleged onset of disability to February 8, 2014, a date after the evidence Scott now claims establish his disability.  Further, the Commissioner argues that the ALJ explained several reasons why he gave APN Livengood's opinions little weight, and Scott's argument overall is nothing more than a contention that he would have weighed the evidence differently.

As explained above, the ALJ's decision must be supported by substantial evidence.  As recently reiterated by the Supreme Court, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in the administrative law context] is not high."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  The ALJ must sufficiently articulate his assessment of the evidence to assure the court he has considered the important evidence and to allow the court to trace the path of his reasoning.  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

---

[4] November 8, 2014 is the date Scott filed his applications for DIB and SSI which were the subject of the ALJ's Decision currently before this Court for review.

Here, the ALJ cogently discussed the extensive evidence of record and supported his conclusions as to the record with citation to substantial evidence.

The ALJ got no further than Step Two before he addressed the evidence of Scott's low back pain, history of lumbar surgery, receipt of lumbar and cervical spine epidural injections, receipt of pain medications, and the results of a 2012 lumbar spine MRI which documented post-operative changes at the L5-S1 including a mild diffuse disc bulge. As for his back pain, the ALJ further considered treatment notes which indicated unremarkable neurological examinations with full range of motion, normal gait, normal coordination, intact reflexes, and otherwise well-preserved strength. The ALJ considered evidence that Scott sought opioids from three different medical providers in direct contravention of a narcotics contract he completed, though recently updated treatment records indicated Scott's conditions were significantly improved when he was compliant with taking his medication. AR 127. As for Scott's mental health issues, the ALJ considered Scott's allegations that depression made him no longer capable of going to work in June 2014, his tearfulness when discussing his ex-wife's miscarriage which happened years before, and his diagnoses of a mood disorder secondary to headaches, bipolar disorder not otherwise specified, and PTSD. With regard to Scott's headaches, the ALJ observed updated treatment records documents improvement in the frequency, duration, and severity of the headaches. The ALJ also considered results of Scott's mental status examinations which were, at various times, largely normal with intact cognition and memory and fair insight and judgment and revealed normal mood and affect and revealed concrete thinking. The ALJ detailed Scott's continued reports of insomnia, headaches, irritability, and social withdrawal.

With regard to Scott's physical and mental issues, the ALJ considered APN Livengood's October 2013 opinions and April 2015 statement. The ALJ gave APN

Livengood's opinions and statement "little weight" as she was not considered an "acceptable medical source" per the regulations, her opinions were internally inconsistent (she initially provided physical limitations for Scott and later indicated she was unable to provide an accurate opinion regarding his physical abilities), and her opinions regarding the number of absences Scott would be expected to have were not fully consistent with the generally unremarkable clinical findings from her examinations. The ALJ correctly observed APN Livengood was *not* an acceptable medical source. *See* 20 C.F.R. § 404.1502(a)(7) (providing "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice" are considered acceptable medical sources only with respect to claims filed on or after March 27, 2017).

The ALJ also complied with 20 C.F.R. § 404.1527. Section 404.1527(f) provides that opinions from medical sources who are not "acceptable medical sources" must be considered using the following factors: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the medical source's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the medical source's opinion. 20 C.F.R. § 404.1527(f). The ALJ here expressly considered the supportability and consistency of APN Livengood's opinions. *See Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021) ("As a general rule, an ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to treating physicians' opinions") (internal citation omitted). The Court does not fault the ALJ for failing to expressly consider every factor of Section 404.1527(c) where the ALJ detailed APN Livengood's treatments notes spanning several years and pertaining to the array of Scott's physical and mental complaints. *See Ray v. Saul*, No. 20-2802, 2021 WL 2710377, at *3 (7th Cir. June 30, 2021) ("we will affirm the ALJ's decision if we

are confident that the ALJ's reasoning sufficiently accounted for the substance of the prescribed factors") (unpublished opinion).

Ultimately, the ALJ built a logical bridge between the record evidence and his RFC finding that Scott remained capable of performing light work with certain additional exertional and nonexertional limitations. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (explaining that the substantial evidence standard is satisfied where the ALJ builds an accurate and logical bridge from the evidence to his conclusion). Though Scott continued to complain of lower and upper back pain and radiating symptoms, his examinations revealed normal results, he reported his medication was helpful, and there were instances during the relevant period when he reported exercising regularly or mowing lawns to make extra money. Though he continued to complain of depression and sleep issues, his visits to a therapist were few, he reported medications helped stabilize his anger, he reported 45 percent of his days were "good/great days" in a mood diary he kept, and he had generally normal mental status examinations. Notably, the State Agency reviewing doctors opined, as the ALJ ultimately found, that Scott was limited to a restricted range of light work activity. The ALJ concurred in part with the State Agency doctors' assessments and Scott does not challenge the ALJ's consideration of those opinions. Those opinions are only further evidence in support of the ALJ's Decision.

The VE's January 2014 hearing testimony does not undermine the ALJ's January 2019 Decision. "Both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). The ALJ determined that Scott's mental and physical health issues did not, in light of the record evidence, support limitations in off-task behavior or absenteeism in excess of that permitted in competitive employment. The ALJ therefore made no error in

relying upon the VE's testimony at the October 2018 hearing which was based upon a hypothetical individual with the same RFC as the one found (and adequately supported) in the 2019 Decision – and one which did not include excessive off task behavior or absenteeism.

As the Commissioner says, Scott simply believes the weight of the evidence supported a finding that he was disabled for all of the relevant period.  For example, in his Supplement (Doc. 17-1 at pg. 1) to the Commissioner's Motion for Summary Affirmance, Scott states he called in sick on 47 days in his last full year of employment as reflected in attendance records which appear in the administrative record that was before the ALJ and to which Scott directs the Court's attention.  As another example, Scott cites in his Motion, "Answer," (Doc. 16") and "Supplement" Dr. Todd Wenck's July 9, 2013 opinion that Scott's disability began May 19, 2011.  But the Court cannot reweigh the record evidence.  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).  Furthermore, the ALJ need not discuss every piece of evidence in the record.  *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

**B**

Scott's miscellaneous other claims of error fare no better.  As for Scott's contention that he never changed the date of the onset of his disability from May 19, 2011 to any other date, the record indicates otherwise.  At the May 2017 hearing pertaining to his 2014 DIB and SSI applications, Scott's counsel explained to the ALJ that "we're looking at February 8 of 2014 which is the day after [Scott's] first application became final" in response to the ALJ's question of the date of alleged onset of disability.  AR 180.  Scott points to nothing in the record to suggest he did

15

not agree with his counsel's statement that the alleged onset date was being amended to February 8, 2014. *See Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) ("a claimant represented by counsel is presumed to have made his best case before the ALJ"). As for his insistence that he should be awarded Social Security benefits from May 19, 2011 (his originally alleged onset date), Scott fails to recognize that his original DIB and SSI applications with that alleged onset date were denied via a February 2014 decision, a decision that is not before the Court. As for Scott's argument that the ALJ wrongfully denied him benefits by ruling strictly based on his age, the "regulations broadly specify that the grids are to be employed and a conclusion *directed* regarding disability when a claimant's 'vocational factors and [RFC] coincide with all of the criteria of a particular rule[.]'" *Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a)) (emphasis added). In his Decision, the ALJ explained, "Beginning on December 6, 2018, the date the claimant's age changed, considering the claimant's age, education, work experience, and [RFC], a finding of 'disabled' is reached by direct application of Medical Vocational Rule[5] 202.06." AR 129.

Finally, Scott complains of the delays in his application process due to the "[SSA's] extensive waiting periods to take actions" and the several months' time awaiting hearing dates and receiving decisions. (Doc. 13 at pg. 5). He states that it was easy to see how his benefit period "unfairly expired" given the long delays. *Id*. The Court understands Scott's frustration with the delays in the process, but those delays were not the reason he was denied DIB or SSI prior to December 6, 2018. The Commissioner correctly points out that Scott's date last insured remained December 31, 2016, regardless of passage of time in the administrative process, and that he had to show his disability began on or before that date in order

---

[5] The Medical-Vocational Rules are also known as the "grid rules."

to be entitled to DIB.  The ALJ considered the extensive medical and other evidence of record, including records that were dated as early as 2010, in order to determine if and/or when Scott became disabled.

**V**

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 13) is DENIED and the Defendant's Motion for Summary Affirmance (Doc. 15) is GRANTED.  The Clerk of Court is directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Kilolo Kijakazi, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Scott J.D., is AFFIRMED." This matter is now terminated.

*It is so ordered.*

Entered on August 24, 2021.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE